UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL C. WILLIAMSON, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 18-cv-2028 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| WILFREDO ORTIZ and | ) | |
| CITY OF CHICAGO, | ) | |
| a municipal corporation, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Defendant Wilfredo Ortiz, a Chicago police officer, shot Plaintiff Michael Williamson and his siblings multiple times at a New Year's party. The state later charged Williamson with pointing a gun at the officer, and the case went to trial. Williamson prevailed. Meanwhile, the Williamson family filed a civil case against Officer Ortiz and the City for excessive force ("*Williamson I*"). Williamson prevailed again.

Williamson later filed this second civil lawsuit ("*Williamson II*") to pursue a claim that he could not bring in *Williamson I*. He brings a claim for unlawful pretrial detention for the 41 days that he spent in custody before release on bond. He filed the complaint in March 2018, more than two years after his release from custody (in February 2014) but less than two years after he was acquitted (in April 2016).

The parties filed cross motions for summary judgment. Defendants Ortiz and the City of Chicago argue that his claim is too late. Williamson, on the other hand, argues that the verdict in his favor in *Williamson I* entitles him to judgment in *Williamson II* as well.

For the reasons stated below, the Court denies both motions.

**Background**

On the last night of 2013, Plaintiff Michael Williamson and his two siblings Kierra and Princeton Williamson celebrated the New Year by attending a family party. *See* Defs.' Resp. to Pl.'s Rule 56.1(a)(3) Statement of Additional Facts, at ¶¶ 2, 7 (Dckt. No. 86).[1] He was in his eighth year of service in the Navy, and was home on leave from Fort Belvoir, Virginia to spend the holidays with his family. *Id.* at ¶¶ 1–2.

The party took place at a residence on the south side of Chicago. *Id.* at ¶ 2. At some point, one of the partygoers (Charles Lewis) decided to end the year with a bang, meaning gunfire. *See* Cplt., at ¶ 7 (Dckt. No. 1). According to the complaint, Lewis went on the back porch and "fired off gunshots into the air in celebration of the new year." *Id.*

The shots caught the attention of a nearby police officer. Defendant Wilfredo Ortiz, an officer with the Chicago Police Department, was only a few blocks away. *See* Defs.' Resp. to Pl.'s Rule 56.1(a)(3) Statement of Additional Facts, at ¶ 3 (Dckt. No. 86). He heard gunshots coming from the direction of the party. *Id.* He ran full speed down an alley toward the shots. *Id.*

When Ortiz arrived at the scene, he was only a short distance from the spot where the celebratory shots had rung out. He stopped only five to ten feet away from the porch, an elevated structure on the back of the home. *Id.* at ¶¶ 4–5. Then, he started shooting, too.

The reason for the shooting is hotly contested. Officer Ortiz insists that he acted in self-defense. *Id.* at ¶ 21. He alleges that Michael Williamson pointed a gun at him, and refused to

---

[1] Sometimes the same undisputed fact appears in multiple filings. Plaintiff filed a Statement of Additional Facts (Dckt. No. 86) in response to Defendants' motion for summary judgment, as well as a Statement of Undisputed Material Facts (Dckt. No. 83) in support of Plaintiff's own motion for summary judgment. The two documents are substantially similar, but not quite identical. The Statement of Additional Facts contains 26 paragraphs, and the Statement of Undisputed Material Facts contains 33 paragraphs.

put it down. *Id.* But Williamson denies pointing a gun at the officer. In fact, he denies having a gun at all.

Whatever precipitated the gunfire, the shots rang out. Officer Ortiz shot all three siblings. *Id.* at ¶¶ 6, 7. He shot Michael Williamson three times. *Id.* at ¶ 6. One bullet hit him in the midline of his back. *Id.* A second bullet struck his right buttock. *Id.* A third bullet penetrated his right shoulder. *Id.* Kierra Williamson suffered a gunshot to the stomach. *Id.* at ¶ 7. Bullets struck Princeton Williamson multiple times in the groin. *Id.*

All told, Officer Ortiz fired eleven bullets. *Id.* at ¶ 5. He shot them in quick succession, causing significant damage to the Williamson family. *Id.* at ¶¶ 5–7. An ambulance rushed all three to the hospital in critical condition. *See* Defs.' Resp. to Pls.' Undisputed Material Facts Pursuant to Local Rule 56.1(A)(3), at ¶ 8 (Dckt. No. 89). All of them survived their injuries.

Michael Williamson needed multiple surgeries, including the attachment of a colostomy bag for injuries for his rectum and the insertion of plates and screws to repair his fractured shoulder. *Id.* at ¶ 9; *see also* Defs.' Resp. to Pl.'s Rule 56.1(a)(3) Statement of Additional Facts, at ¶ 8 (Dckt. No. 86). He spent 14 days in two hospitals. *See* Pl.'s Resp. to Defs.' Rule 56.1 Statement of Uncontested Facts, at ¶ 11 (Dckt. No. 77). On January 14, 2014, he was transferred to the medical wing of the Cook County Jail, where he stayed for about a month. *Id.* at ¶ 12.

An investigation began on the night of the shooting. *See* Defs.' Resp. to Pl.'s Rule 56.1(a)(3) Statement of Additional Facts, at ¶¶ 9–12 (Dckt. No. 86). Officer Ortiz told two detectives that he fired his gun in self-defense. *Id.* at ¶ 11. According to him, Michael Williamson "raised a handgun, pointed it in his direction and refused verbal commands to drop it." *Id.* at ¶¶ 11, 14. That night, Ortiz told the same story to an Assistant State's Attorney, knowing that the state could rely upon it for a possible prosecution. *Id.* at ¶¶ 14, 15.

The presence of a firearm is undisputed. The parties agree that a "firearm was found on the back porch where plaintiff had been standing at the time of the shooting incident." *See* Pls.' Resp. to Defs.' Local Rule 56.1(a)(3) Statement of Additional Facts, at ¶ 6 (Dckt. No. 98). The passive voice clouds who found it – presumably officers investigating the scene after the shooting. But Ortiz was the only person who claimed that Plaintiff Williamson held the gun and pointed it at him. *See* Defs.' Resp. to Pl.'s Rule 56.1(a)(3) Statement of Additional Facts, at ¶ 16 (Dckt. No. 86).

On January 1, 2014, the night of the shooting, Michael Williamson was arrested. *Id*. at ¶ 17. The state charged him with three gun felonies: (1) aggravated assault with a handgun; (2) reckless discharge of a firearm; and (3) aggravated unlawful use of a weapon. *Id*. Ortiz signed all three criminal complaints and was the complaining witness. *Id*. at ¶¶ 18, 19.

Based on the nature of the charges, the state court judge detained Williamson and set his bond at $50,000. *Id*. at ¶ 20. After discharge from the hospital, he was incarcerated at the medical wing of the Cook County Jail. *See* Defs.' Revised Resp. to Pl.'s Requests for Admission, at ¶ 29 (Dckt. No. 83-1). He was confined to a wheelchair and tethered to a colostomy bag. *Id.*

He remained in custody for 41 days until he posted bond on February 11, 2014. *See* Pl.'s Resp. to Defs.' Rule 56.1 Statement of Uncontested Facts, at ¶ 12 (Dckt. No. 77). In his deposition, Williamson testified that it took his family some time to scrape together the money for his bond. *See* Defs.' Rule 56.1 Statement of Uncontested Facts, Exhibit A, Williamson Dep. 32:24 – 33:15 (Dckt. No 66). After almost six weeks, he was finally released from custody. *See* Pl.'s Resp. to Defs.' Rule 56.1 Statement of Uncontested Facts, at ¶ 12.

4

The criminal case went to trial the spring of 2016, more than two years after the shooting. *See* Defs.' Resp. to Pl.'s Rule 56.1(a)(3) Statement of Additional Facts, at ¶ 24 (Dckt. No. 86). Officer Ortiz testified that Williamson took a "tactical stance" on the porch, raised the gun in his direction, and refused verbal commands to drop it. *Id.* at ¶ 21. Ortiz was the only witness who testified that Williamson possessed a gun and pointed it at him. *Id.* at ¶¶ 22–23.

On April 6, 2016, the state court judge ultimately found Williamson not guilty of all charges. *Id.* at ¶ 24; *see also* Defs.' Revised Resp. to Pl.'s Requests for Admission, at ¶ 37 (Dckt. No. 83-1). The acquittal cleared Williamson's name, but it was not enough to save his naval career. Before trial, the Navy discharged Williamson based on the criminal charges. *See* Defs.' Resp. to Pl.'s Rule 56.1(a)(3) Statement of Additional Facts, at ¶ 25 (Dckt. No. 86).

In the meantime, the Williamson family filed a civil case. In 2014, Kierra Williamson sued Officer Ortiz in the U.S. District Court for the Northern District of Illinois, alleging excessive use of force ("*Williamson I*"). *See Williamson v. Ortiz*, Case No. 14-cv-6397 (N.D. Ill.). In 2015, Michael and Princeton Williamson joined *Williamson I. See* First Am. Cplt. in *Williamson v. Ortiz*, Case No. 14-cv-6397 (Dckt. No. 35). They also brought a few other claims, including a *Monell* claim against the City of Chicago. *Id*.

Extensive discovery followed. Judge Coleman set the case for trial in September 2017. *See* 4/1/16 Order in *Williamson v. Ortiz*, Case No. 14-cv-6397 (Dckt. No. 66).

Then, a few months before trial, the Supreme Court recognized a new cause of action under section 1983 for unlawful pretrial detention *after* the start of legal process. *See Manuel v. City of Joliet*, 137 S. Ct. 911 (2017). In response, Michael Williamson filed a motion to amend the complaint and add an unlawful pretrial detention claim. *See* 7/26/17 Mtn. in *Williamson v. Ortiz*, Case No. 14-cv-6397 (Dckt. No. 157). But it was too late in the day to unveil a new

theory.  Judge Coleman denied that motion for practical reasons, finding that an amendment "at this late juncture" would "prejudice the defendants" and "strain[] the Court's resources."  *See* 8/15/17 Order in *Williamson v. Ortiz*, Case No. 14-cv-6397 (Dckt. No. 162).

*Williamson I* proceeded to trial on only the excessive force claims.  *See* Jury Instructions in *Williamson v. Ortiz*, Case No. 14-cv-6397 (Dckt. No. 228, at 18 of 24); *see also* Verdict Form in *Williamson v. Ortiz*, Case No. 14-cv-6397 (Dckt. No. 229).  The jury returned a verdict in favor of the three Williamson siblings.  The Court ultimately entered a judgment in their favor for compensatory and punitive damages totaling $4,750,000.  *See* Defs.' Resp. to Pls.' Undisputed Material Facts Pursuant to Local Rule 56.1(A)(3), at ¶¶ 32, 33 (Dckt. No. 89); Defs.' Resp. to Pl.'s Rule 56.1(a)(3) Statement of Additional Facts, at ¶¶ 6, 7 (Dckt. No. 86); *see also* Judgment in *Williamson v. Ortiz*, Case No. 14-cv-6397 (Dckt. No. 227).

That judgment did not end the dispute between the parties.  Because the claim of unlawful pretrial detention arrived late in the game, it was not part of *Williamson I*.  So on March 20, 2018, Michael Williamson filed the case currently before the Court ("*Williamson II*").  He advanced the unlawful pretrial detention claim that he attempted to add in *Williamson I*.  *See* Cplt. (Dckt. No. 1).

In the case at hand, Michael Williamson advances a claim against Officer Ortiz for the unlawful deprivation of liberty under the Fourth Amendment.  *Id.*  Specifically, he alleges that he was incarcerated before trial for 41 days without probable cause.

He claims that Ortiz made up the whole story about Williamson pointing a gun.  Ortiz "fabricated police reports, signed false criminal complaints and provided perjured and false testimony to prosecutors in order to have the Plaintiff charged and prosecuted with a felony

offense." *Id.* at ¶ 12. He alleges that he was incarcerated in Cook County Jail as a result of the fabricated evidence. *Id.* at ¶ 17. He also brings an indemnification claim against the City.

The parties later filed cross motions for summary judgment. Officer Ortiz and the City argue that Williamson filed suit too late. Williamson argues that his victory in *Williamson I* requires victory in *Williamson II*, too.

### Legal Standard

Rule 56 provides that the Court "shall grant" summary judgment when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute about a material fact exists if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The substantive law controls which facts are material. *Id.* After a "properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 250 (internal quotations omitted).

The Court "'consider[s] all of the evidence in the record in the light most favorable to the non-moving party, and [ ] draw[s] all reasonable inferences from that evidence in favor of the party opposing summary judgment.'" *Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018) (citation omitted). The non-moving party receives "the benefit of reasonable inferences from the evidence, but not speculative inferences in [its] favor." *White v. City of Chicago*, 829 F.3d 837, 841 (7th Cir. 2016) (internal citations omitted).

**Discussion**

The parties filed cross motions for summary judgment. Defendants argue that Williamson's claim is time barred. *See generally* Defs.' Mem. in Supp. of Mtn. for Summ. J. (Dckt. No. 65). On the flipside, Williamson argues that the jury in *Williamson I* already decided all of the issues in this case in his favor. So the jury's finding in *Williamson I* requires judgment in his favor in this case, too. *See generally* Pl.'s Mem. in Supp. of Mtn. for Summ. J. (Dckt. No. 84).

The Court denies both motions.

## I.     Defendants' Motion for Summary Judgment:  Claim Accrual and the Statute of Limitations

Defendants moved for summary judgment based on the statute of limitations. The motion rises or falls depending on when the claim accrued.

The material facts are undisputed. *See* Pl.'s Resp. to Defs.' Rule 56.1 Statement of Uncontested Facts, at ¶¶ 6, 10–13 (Dckt. No. 77); Defs.' Resp. to Pls.' Undisputed Material Facts Pursuant to Local Rule 56.1(A)(3), at ¶¶ 21, 25 (Dckt. No. 89). Williamson was arrested on January 1, 2014. A judge found probable cause to detain him on January 3, 2014. He was released on February 11, 2014. He was acquitted of all criminal charges on April 6, 2016. And he filed this lawsuit on March 20, 2018.

The parties disagree about when the unlawful pretrial detention claim accrued. Officer Ortiz and the City argue that the claim accrued when Williamson left custody in February 2014. On the flipside, Williamson argues that the claim accrued when he was acquitted in April 2016.

The Court concludes that his claim did not accrue until he prevailed in his criminal case on April 6, 2016. He filed suit on March 20, 2018, less than two years later. So his claim is timely.

### A.       Roadblocks to Claim Accrual

The timeliness of a claim under section 1983 involves a mix of state and federal law. State law determines the length of the limitations period. *See Wallace v. Kato*, 549 U.S. 384, 387 (2007). The parties agree that the limitations period under Illinois law is two years. *See Lewis v. City of Chicago*, 914 F.3d 472, 478 (7th Cir. 2019). But federal law determines when the statute of limitations starts to run (that is, when a claim accrues). *See Wallace*, 549 U.S. at 388 ("[T]he accrual date of a § 1983 cause of action is a question of federal law that is *not* resolved by reference to state law.") (emphasis in original). State law determines how much time is on the clock, and federal law determines when the clock starts to tick.

The statute of limitations begins to run on the date the claim accrues, that is, when the plaintiff has a "complete and present cause of action." *See, e.g.*, *Bay Area Laundry & Dry Cleaning Pension Tr. Fund v. Ferbar Corp. of California*, 522 U.S. 192, 195 (1997) ("Unless Congress has told us otherwise in the legislation at issue, a cause of action does not become 'complete and present' for limitations purposes until the plaintiff can file suit and obtain relief.").

Usually, a claim accrues when the underlying wrong is complete. *See Manuel v. City of Joliet*, 903 F.3d 667, 669 (7th Cir. 2018) (*Manuel II*). The wrong is complete at different times for different types of claims. For example, when a plaintiff claims that an illegal search violated her Fourth Amendment rights, the wrong is complete when the search ends, so the claim ordinarily accrues when the search is over. *Id.* Likewise, when a plaintiff claims that she is detained without probable cause under the Fourth Amendment, the wrongful act ends when she is released. *Id.* ("When a search or seizure causes injury independent of time spent in custody, the claim accrues immediately; but when the objection is to the custody, a different approach must control."). In that case, the end of detention usually starts the clock.

Some wrongs are continuing, and the continuation of the wrong prevents the clock from starting. "When a wrong is ongoing rather than discrete, the period of limitations does not commence until the wrong ends." *Id.*; *see also id.* ("Notice that we speak of a continuing *wrong*, not of continuing *harm*; once the wrong ends, the claim accrues even if that wrong has caused a lingering injury.") (emphasis in original). The "wrong of detention without probable cause continues for the duration of the detention," so the claim accrues "when the detention ends." *Id.* at 670.

However, "a claim cannot accrue until the would-be plaintiff is entitled to sue." *Id.* And, in some situations, another legal doctrine blocks a plaintiff from bringing a claim, even though the underlying claim is complete. *See generally Preiser v. Rodriguez*, 411 U.S. 475 (1973). When that's the case, the statute doesn't run until the other roadblock is removed. *Id.*

This rule makes common sense. Plaintiffs shouldn't be *required* to sue before they're *able* to sue. The clock can't start ticking on a claim that a plaintiff is not yet entitled to bring. Instead, the clock starts ticking when the plaintiff has a clear path to the courthouse, with no legal doctrine standing in the way. A plaintiff cannot go forward with a claim until (1) the wrong is complete and (2) all of the roadblocks are out of the way. Two of those "blocking doctrines" are potentially relevant in this case.

First, plaintiffs who are *currently* detained with judicial approval cannot bring a section 1983 suit about the lawfulness of their detention. *See Preiser*, 411 U.S. at 499; *Manuel II*, 903 F.3d at 670. Plaintiffs in that position can challenge their detention under federal habeas statutes by filing a habeas petition. And in *Preiser*, the Supreme Court held that a habeas petition is the exclusive way for an inmate to challenge the fact or duration of confinement. *See Preiser*, 411

U.S. at 475. A civil case under section 1983 has to wait until detention ends because there is another road to relief.[2]

So there are two reasons why the statute of limitations does not begin to run on a claim about unlawful pretrial detention until the detention ends. A claim does not accrue until the wrong is complete (*Manuel II*), and an ongoing incarceration is an ongoing wrong. Also, the existence of a federal habeas remedy prevents the inmate from seeking relief under section 1983 (*Preiser*).

Second, plaintiffs cannot bring a section 1983 suit that would "necessarily imply" the invalidity of a criminal conviction or ongoing criminal proceedings. This rule comes from two Supreme Court cases, *Heck v. Humphrey*, 512 U.S. 477 (1994), and *McDonough v. Smith*, 139 S. Ct. 2149 (2019).

In *Heck*, the plaintiff brought a section 1983 claim while serving a 15-year sentence for manslaughter. *See Heck*, 512 U.S. at 477. He alleged that the state prosecutors had engaged in various kinds of misconduct. *Id.* at 478–79. He wasn't seeking release, so his suit wasn't blocked by *Preiser*. *Id.* at 481. Instead, he sought damages. But given the nature of his claims, a judgment in his favor in the civil case necessarily would have implied that his criminal conviction was invalid. *Id.* at 479, 490.

The Supreme Court held that a plaintiff who is *convicted* of a crime cannot bring a section 1983 claim if (1) a judgment in her favor would "necessarily imply" the invalidity of her

---

[2] For example, in *Manuel II*, the plaintiff was arrested and held pursuant to a finding of probable cause beginning on March 18, 2011. *See Manuel v. City of Joliet*, 903 F.3d 667, 670 (7th Cir. 2018). On May 4, 2011, the prosecutor dismissed the charges. *Id.* And on May 5, Manuel was released. *Id.* Later, Manuel brought a claim for damages under section 1983 alleging that he was detained without probable cause. *Id.* The Seventh Circuit held that Manuel was blocked from bringing his claim until May 5, the day he was released, because "the existence of detention forbids a suit for damages contesting that detention's validity." *Id.*

conviction, and (2) her conviction has not been overturned, expunged, or otherwise declared invalid. *See Heck*, 512 U.S. at 487. That rule avoided the possibility of parallel civil and criminal actions and, more importantly, the possibility of conflicting civil and criminal judgments on the same issue. *Id*. at 484–86.

In *McDonough*, the Supreme Court extended that principle to cases involving pending criminal cases. *McDonough* involved a criminal defendant who filed a section 1983 case alleging that the defendants had fabricated evidence against him. *See McDonough*, 139 S. Ct. at 2153–54. He filed suit after his acquittal. The parties disagreed about when his claim accrued: when the wrong was complete (that is, when he learned about the fabricated evidence), or when he was acquitted. The question was whether the claim accrued while criminal proceedings were ongoing.

The *Heck* bar did not come into play because McDonough was never convicted. *Id*. at 2157 ("This case differs from *Heck* because the plaintiff in *Heck* had been convicted, while McDonough was acquitted."). His civil case could not have undercut a criminal conviction because there was no conviction to undercut. But the same principle applied. His civil case would have challenged the "validity of the criminal proceedings" in the same way that the plaintiff in *Heck* challenged the "validity of his conviction." *Id.* at 2158. If he had prevailed in the civil case while the criminal case was ongoing, the civil case would have undercut the criminal case through the backdoor.

The Supreme Court held that his civil claim did not accrue "until the criminal proceedings . . . terminated in his favor." *Id.* at 2155. A civil claim that "challenge[s] the validity of the criminal proceedings" must wait until he prevails in the criminal case. *Id.* at 2158. Pragmatic considerations – such as the need to avoid a collateral attack on an ongoing criminal

12

case – carried the day. *Id.* at 2155; *see also id.* at 2157 (citing the need for finality and consistency); *id.* at 2158 (drawing upon "core principles of federalism, comity, consistency, and judicial economy"). In sum, a former detainee has a "complete and present cause of action for the loss of his liberty only once the criminal proceedings against him terminated in his favor." *Id.* at 2159.

The Seventh Circuit recently summarized the *Heck / McDonough* rule in *Savory*. A plaintiff cannot sue "whenever there is no logical way to reconcile [a plaintiff's § 1983] claims with a valid conviction," whether that conviction has already been handed down, or is merely anticipated. *Savory v. Cannon*, 947 F.3d 409, 417 (7th Cir. 2020). A roadblock prevents a plaintiff from bringing her section 1983 claim until "the criminal proceeding end[s] in the defendant's favor or the resulting conviction [is] invalidated within the meaning of *Heck*." *Id.* at 418. And the roadblock means that the clock doesn't start ticking, because the clock runs only when the plaintiff is free to sue.

### B.    The *Heck / McDonough* Roadblock in Unlawful Detention Claims

The parties agree that, in the absence of any blocking doctrine, a Fourth Amendment unlawful detention claim accrues when the plaintiff is released from custody. *See* Defs.' Reply in Support of Their Mtn. for Summ. J., at 1–5 (Dckt. No. 85); Pl.'s Mem. of L. in Support of Pl.'s Resp. to Defs.' Mtn. for Summ. J., at 4–6 (Dckt. No. 78); *Manuel II*, 903 F.3d 667, 669 (7th Cir. 2018). However, they disagree about whether the *Heck / McDonough* blocking doctrine can ever apply to Fourth Amendment unlawful detention claims. *Id.*

The Seventh Circuit recently settled this issue in *Sanders*, after the parties submitted their briefs. *See Sanders v. City of St. Joseph*, 806 F. App'x. 481, 484 (7th Cir. 2020). Sanders, the plaintiff, was detained on September 19, 2016. He was transferred to a different facility on

September 26, 2016, and was released from custody about four months later. *Id*. The parties

disagreed about when the claim accrued. The City argued that his claim accrued when he was

transferred on September 26, but plaintiff argued that his claim accrued when he was released in

2017. *Id*.

The Seventh Circuit applied a two-step analysis. First, the Court of Appeals applied

*Manuel II*, explaining that Sanders's "claim of unlawful detention accrued, at the earliest, when

he was released from jail," not when the transfer happened. *Id*. After the transfer, he was still in

custody, so the clock did not start ticking. Second, the Seventh Circuit applied *Heck* and

*McDonough*, asking whether "a conclusion that Sanders's confinement was unconstitutional

would imply the invalidity of an ongoing criminal proceeding or a prior criminal conviction."

*Id*. at 484 n.2. The Court of Appeals concluded that it did not have enough information to

answer that second question. But if the civil case had undermined the criminal case, "*Heck*

would continue to bar Sanders's claim after his release and until either those proceedings

terminated in his favor or the conviction was vacated." *Id*.

In the wake of *Sanders*, a number of district courts have adopted the same two-step

approach. For example, in *Barnett*, the plaintiff alleged that an officer "made false statements in

[a] police report and that those statements formed the basis for the probable cause

determination." *See Barnett v. City of Chicago*, 2020 WL 4336063, at *3 (N.D. Ill. 2020). The

parties disagreed about whether his claim accrued when he was released from detention or when

he was acquitted. First, the court applied *Manuel II*, holding that, in the absence of any blocking

doctrine, Barnett's claim would have accrued on the day that he was released. *Id*. Second, the

court applied *Heck* and *McDonough*, and asked whether a civil judgment in Barnett's favor

would necessarily imply the invalidity of a criminal conviction. *Id*. The court found that the

civil case would have undercut the criminal case. Barnett's Fourth Amendment claim "center[ed] on evidence used to secure an indictment and at a criminal trial," thus "directly challenge[d] and necessarily threaten[ed] to impugn . . . the prosecution itself." *Id*. at *4. Therefore, Barnett's claim did not accrue until he was acquitted on December 2, 2016.

Other courts in this district have reached the same conclusion. *See, e.g., Moore v. City of Chicago*, 2020 WL 3077565, at *4 (N.D. Ill. 2020) (holding that a defendant's Fourth Amendment unlawful pretrial detention claim did not accrue until he was acquitted under *Heck* and *McDonough*) ("Defendants argue that *Heck* has nothing to do with unlawful pretrial detention claims brought under the Fourth Amendment. They argue that plaintiff's claims expired almost a decade ago, two years after he was released on bond. Not so."); *Culp v. Flores*, 454 F. Supp. 3d 764, 769 (N.D. Ill. 2020) ("Because, given the nature of his Fourth Amendment claim, a finding that Culp's detention in jail was unconstitutional would imply the invalidity of the charges brought against him, *Heck* barred that claim until those charges were dismissed."); *Spencer v. Vill. of Arlington Heights*, 2020 WL 4365640, at *2 (N.D. Ill. 2020) (holding that a plaintiff's Fourth Amendment claim did not accrue until he was acquitted because a successful civil claim would have "impl[ied] the invalidity of the criminal proceedings").

Ortiz and the City of Chicago cite three cases decided in this district after *McDonough*. Each holds that the plaintiff's unlawful pretrial detention claim accrued when they were released. *See* Defs.' Reply in Support of Their Mtn. for Summ. J., at 4–6 (Dckt. No. 85). But the cases do not help their cause.

First, defendants point to *Mitchell v. City of Elgin*, 912 F.3d 1012, 1016 (7th Cir. 2019). In *Mitchell*, the Seventh Circuit concluded that the plaintiff's Fourth Amendment pretrial detention claim accrued when her detention ended. *Id*. However, the court did not consider

15

whether *Heck / McDonough* applied, too. *Id*. Instead, its analysis focused on the issue presented by the parties: whether a plaintiff released on bond with conditions could still be considered detained. *Id*. So *Mitchell* did not address the issue at hand.

Next, defendants turn to *Mayo v. LaSalle County* and *Smith v. City of Chicago*. Defendants correctly point out that both cases hold that the *Heck / McDonough* bar does not apply to Fourth Amendment unlawful detention claims. *See Smith v. City of Chicago*, 2019 WL 4242503, at *3 (N.D. Ill. 2019) (holding that *McDonough* has no bearing on Fourth Amendment unlawful detention claims); *Mayo v. LaSalle Cty.*, 2019 WL 3202809, at *4 (N.D. Ill. 2019) (holding that *Heck* and *McDonough* have no bearing on Fourth Amendment unlawful detention claims, and that "the statute of limitations on a pretrial detention claim begins running as soon as the plaintiff is released from custody, regardless of whether criminal charges remain pending"). However, both cases predate *Sanders*, and the Seventh Circuit came out the other way.

To sum up, a plaintiff cannot sue on an unlawful pretrial detention claim until all of the roadblocks are out of the way. First, a plaintiff cannot bring a claim before the detention ends. Second, a plaintiff cannot challenge detention until the criminal case ends in his or her favor, if the civil case calls into question the validity of the criminal proceeding. Putting them together, a plaintiff cannot sue before release from custody, and before the criminal case is over. When both roadblocks are out of the way, the plaintiff has the green light to sue. And at that point, the clock starts ticking on the statute of limitations.

In other words, ending detention is a necessary but not a sufficient condition for the statute of limitations to begin to run on an unlawful detention claim. The statute of limitations cannot begin to run before confinement ends. But release from custody does not necessarily start the clock running, either. It depends on whether there is an ongoing criminal case, and whether

the civil case would necessarily conflict with the criminal case. If so, the clock remains stopped. So the statute of limitations can't begin to run until the inmate is released, but the clock might remain stopped for another reason.

### C. Application

Applying the two-step inquiry, the Court finds that Williamson's claim is timely. Two roadblocks stood in his way to the federal courthouse. The first roadblock came down when he left detention on February 11, 2014. *See Manuel II*, 903 F.3d at 670. At that moment, the wrong was complete. The second roadblock lifted on April 16, 2016, when he was acquitted. At that point, both roadblocks were gone, and he had the green light to sue. So the clock started ticking.

The first roadblock was Williamson's detention. Williamson was not released from custody until February 11, 2014. So, his claim could not accrue before that date. *Id.*; *Preiser*, 411 U.S. at 475. If that roadblock was the only one standing in his way, then his claim would be untimely. He did not bring the claim until March 2018, more than four years later. But the other roadblock stood in his path, too.

The second roadblock was the pending criminal case. The question under *Heck* / *McDonough* is whether a "conclusion that [the plaintiff's] confinement was unconstitutional would imply the invalidity of an ongoing criminal proceeding or a prior criminal conviction." *Sanders*, 806 F. App'x. at 484. The Court concludes that Williamson could not prevail in his civil case without undercutting the criminal case. So he could not sue before he was acquitted in April 2016.

The notion that Officer Ortiz is lying is key to Williamson's civil claim. To find Ortiz liable for unlawful detention, a jury would need to find that he: (1) "knowingly or intentionally or with a reckless disregard for the truth," (2) "made false statements to the judicial officer," and

(3) "that the false statements were necessary to the judicial officer's determination that probable cause existed for the arrest." *Lewis v. City of Chicago*, 914 F.3d 472, 477 (7th Cir. 2019) (citations omitted); *see also Barnett*, 2020 WL 4336063, at *3.

But the notion that Ortiz was telling the truth was key to Williamson's criminal case. The government charged Williamson with three gun felonies: aggravated assault with a handgun, reckless discharge of a firearm, and aggravated unlawful use of a weapon. *See* Defs.' Resp. to Pl.'s Rule 56.1(a)(3) Statement of Additional Facts, at ¶ 18 (Dckt. No. 86). To convict him, the government needed to prove that Williamson possessed a gun and pointed it at the officer.

The testimony of Ortiz was the linchpin of the state's entire case. Ortiz was "the only person to claim that Michael Williamson pointed a gun at him on January 1, 2014." *See* Defs.' Resp. to Pls.' Undisputed Material Facts Pursuant to Local Rule 56.1(A)(3), at ¶ 17 (Dckt. No. 89). At trial, Ortiz was the only witness who testified that Michael Williamson possessed a gun, pointed it at the officer, and refused to put it down. *Id.* at ¶ 24. Therefore, to convict Williamson, a court would need to find that Ortiz was telling the truth.[3]

The falsity of Ortiz's testimony is key to the civil case. For Williamson to prevail in the civil case, the jury would need to find that Ortiz was a liar. But the truthfulness of Ortiz's testimony was key to the criminal case. For the state to prevail in the criminal case, the state court would have needed to find that Ortiz was telling the truth.

The two cases are therefore inconsistent with each other. One case requires a finding that Ortiz is lying, and the other required a finding that he was telling the truth. A civil verdict in

---

[3] The parties did not file a copy of Williamson's indictment or a transcript from the criminal trial. They did not identify the specific statute that he was charged under, either. So, it is difficult to say with precision whether it would have been impossible to convict Williamson without Ortiz's testimony.

Williamson's favor would require a finding that the officer was lying, and thus would undercut a necessary part of the state's case in the criminal matter.

Until he was acquitted, the criminal case blocked Williamson from pursuing his civil case. A civil judgment in his favor would have "impl[ied] the invalidity of an ongoing criminal proceeding." *Sanders*, 806 F. App'x. at 484 n.2. The roadblock remained in place until he was acquitted on April 6, 2016. Since Williamson brought suit on March 20, 2018, less than two years later, he falls within the two-year statute of limitations. So his claim is not time barred.

## II.    Plaintiff's Motion for Summary Judgment:  Collateral Estoppel

Williamson moved for summary judgment based on the doctrine of collateral estoppel. He argues that the jury's verdict in his favor in *Williamson I* requires judgment in his favor in this case, too. *See* Pl.'s Memo. in Support of Pl.'s Mtn. for Summ. J., at 1 (Dckt. No. 84).

Collateral estoppel (*i.e.*, issue preclusion) "bars a party from asserting a claim that has been resolved in another lawsuit between the same parties (or those in privity with them)." *Santa's Best Craft, LLC v. St. Paul Fire & Marine Ins. Co.*, 611 F.3d 339, 356 (7th Cir. 2010) (citations omitted). This case involves offensive collateral estoppel, which "occurs when the plaintiff seeks to foreclose the defendant from litigating an issue the defendant has previously litigated unsuccessfully" in another case. *See Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 n.4 (1979).

"The preclusive effect of a federal-court judgment is determined by federal common law." *Taylor v. Sturgell*, 553 U.S. 880, 891 (2008); *see also Bailey v. Andrews*, 811 F.2d 366, 369 (7th Cir. 1987). Under federal common law, for collateral estoppel to apply, "(1) the issue sought to be precluded must be the same as that involved in the prior litigation, (2) the issue must have been actually litigated, (3) the determination of the issue must have been essential to the

final judgment, and (4) the party against whom estoppel is invoked must be fully represented in the prior action." *Matrix IV, Inc. v. Am. Nat. Bank and Trust Co. of Chicago*, 649 F.3d 539, 547 (7th Cir. 2011) (quoting *H-D Mich., Inc. v. Top Quality Serv., Inc.*, 496 F.3d 755, 760 (7th Cir. 2007)).

Collateral estoppel takes away a party's ability to litigate an issue. So, the earlier case and the later case need to be on all fours. Collateral estoppel applies to factual inferences that necessarily flow from a general verdict. *See Kluppelberg v. Burge*, 276 F. Supp. 3d 773, 776 (N.D. Ill. 2017). The inferences must be *necessary* inferences, meaning that a rational jury *must* have made such findings en route to its general verdict. *See Bravo-Fernandez v. United States*, 137 S. Ct. 352, 358 (2016) ("The allied doctrine of issue preclusion ordinarily bars relitigation of an issue of fact or law raised and necessarily resolved by a prior judgment."); *Melendez v. Illinois Bell Tel. Co.*, 79 F.3d 661, 670 (7th Cir. 1996) ("The general verdict of a jury can only bind the judge with respect to issues that were essential to the jury's decision."). If there was another path for the jury to reach the same conclusion, then collateral estoppel does not apply.

To determine whether a particular factual finding was "necessary" to a general verdict, courts look at the jury instructions and verdict in the earlier case. *See, e.g.*, *Grogan v. Garner*, 498 U.S. 279, 281–82 (1991) (assessing whether a party was estopped from re-litigating a finding of fraud by examining the jury instructions and the verdict in the prior case); *Gerard v. Gerard*, 780 F.3d 806, 811 (7th Cir. 2015) (assessing an estoppel argument by looking at the jury instructions and the verdict in the earlier case); *Ross-Berger Companies, Inc. v. Equitable Life Assur. Soc. of the U.S.*, 872 F.2d 1331, 1337 (7th Cir. 1989).

To prevail in this case, Williamson must prove that Officer Ortiz made a false statement. A claim of unlawful detention under the Fourth Amendment requires proof that an officer

(1) "knowingly or intentionally or with a reckless disregard for the truth" (2) "made false statements to the judicial officer" and (3) the "false statements were necessary to the judicial officer's determination that probable cause existed for the arrest." *Lewis v. City of Chicago*, 914 F.3d 472, 477 (7th Cir. 2019) (citations omitted); *see also Franks v. Delaware*, 438 U.S. 154, 155–56 (1978); *Brunson v. Murray*, 843 F.3d 698, 709 (7th Cir. 2016); *Barnett*, 2020 WL 4336063, at *3. So collateral estoppel applies only if the jury necessarily found each of those elements when rendering its general verdict in *Williamson I*.

*Williamson I* involved an excessive force claim. *See* Defs.' Resp. to Pls.' Undisputed Material Facts Pursuant to Local Rule 56.1(A)(3), at ¶ 26 (Dckt. No. 89); *Williamson v. Ortiz*, 2018 WL 3770072, at *1 (N.D. Ill. Aug. 9, 2018) (an opinion in *Williamson II*, describing *Williamson I*). Judge Coleman instructed the jury that Williamson had the burden to prove two facts: (1) "Defendant intentionally used force against the plaintiff," and (2) "[t]he force Defendant used against the plaintiff was unreasonable." *See* Defs.' Resp. to Pls.' Undisputed Material Facts Pursuant to Local Rule 56.1(A)(3), at ¶ 29 (Dckt. No. 89); *see also* Jury Instructions in *Williamson v. Ortiz*, Case No. 14-cv-6397 (Dckt. No. 228, at 18 of 24).

The jury also received an instruction about punitive damages. Judge Coleman instructed: "You may assess punitive damages only if you find that the Defendant's conduct was malicious or in reckless disregard of Plaintiffs' rights." *See* Defs.' Resp. to Pls.' Undisputed Material Facts Pursuant to Local Rule 56.1(A)(3), at ¶ 31 (Dckt. No. 89); *see also* Jury Instructions in *Williamson v. Ortiz*, Case No. 14-cv-6397 (Dckt. No. 228, at 21 of 24). The Court then explained what it means for conduct to be malicious or reckless. *Id.*

The jury returned a verdict in Williamson's favor, and he recovered compensatory and punitive damages. *See* Defs.' Resp. to Pls.' Undisputed Material Facts Pursuant to Local Rule

56.1(A)(3), at ¶¶ 32, 33 (Dckt. No. 89). So, by definition, the jury found that Williamson had satisfied his burden of proof on both liability and damages, including punitive damages. According to the jury, Williamson intentionally used unreasonable force, and his conduct was malicious or reckless.

But the jury received no special interrogatories. *See* Pls.' Resp. to Defs.' Local Rule 56.1(a)(3) Statement of Additional Facts, at ¶ 4 (Dckt. No. 98). The jury did not explain why, exactly, it reached its decision. It did not find any facts with particularity. Instead, it simply reached a general verdict. So the general verdict in *Williamson I* can require judgment in his favor in *Williamson II* only if the *necessary* inferences from the verdict compel it.

Williamson basically argues that a jury already concluded that Officer Ortiz was lying. In *Williamson I*, Ortiz testified that he acted in self-defense because Williamson pointed a gun at him. In Williamson's view, the jury already heard that story, and rejected it. The jury found that Ortiz used excessive force against Williamson, which necessarily means (so the argument goes) that the jury found that he was lying. So if the last jury decided that he was lying, there is no need for a second jury to decide the same issue a second time.

The issues in the two cases are not the same. *Williamson I* and *Williamson II* involve the same incident, and the parties will tell the same stories in each case. But the issues are different. The jury did not *necessarily* find any of the three elements for an unlawful detention claim, let alone all of them. It was possible that the jury found in Williamson's favor on the excessive force claim without finding any of the elements of an unlawful detention claim (again, a false statement, with *mens rea*, that was necessary to a finding of probable cause).

First, Williamson must prove that Ortiz made a false statement to prevail in *Williamson II*. But Williamson didn't have to prove that Ortiz made a false statement to prevail in

*Williamson I.*  That is, a false statement by the officer was *a* path to victory in *Williamson I*, but it was not the *only* path to victory.

It's certainly possible that the jury in *Williamson I* thought the officer was lying.  But that's not a *necessary* inference.  The jury could have concluded that the officer used excessive force for some other reason.

Consider the facts.  Officer Ortiz sprayed the scene with 11 bullets in quick succession, hitting three people (and grazing a fourth).  The jury could have found that Ortiz did, in fact, see Williamson with a gun.  And they could have found that Williamson refused the command to put the gun down, just as Ortiz testified.  But the jury still could have found that Ortiz responded with excessive force.

Maybe the jury found that he fired his weapon too soon.  Or too many times, firing too many bullets.  Or shot Williamson too many times.  Or hit too many people.  Or put too many lives at risk.  Or maybe the jury found that he should not have fired into a gathering late at night, when it presumably was difficult to see.  The sheer number of bullets – and the number of victims of the gunfire – could have provided all that the jury needed to find against Officer Ortiz. Even if they believed him.

A finding of a false statement was not *necessary* to the jury's verdict in *Williamson I*.  It was possible for Plaintiff Williamson to prevail in *Williamson I* without a finding by the jury that Officer Ortiz was lying.  The possibility that Ortiz was lying is a possible inference – but not a *necessary* inference – of the jury verdict in *Williamson I*.  The jury could have concluded that the officer was telling the truth, and returned a verdict against him anyway.  So there needs to be a trial in *Williamson II*.

If Williamson wanted to foreclose a second trial (in *Williamson II*, this case), he could have requested special interrogatories in the first trial (in *Williamson I*), to get more insight into the basis for the jury's decision. But he didn't. The jury didn't find any specific facts. So, all that is left is a general verdict, leaving questions unanswered. The unanswered questions leave room to doubt whether the jury thought that the officer was lying.

Second, the jury in *Williamson I* did not decide the *mens rea* question, either. *See Lewis*, 914 F.3d at 477. The jury in *Williamson I* did not necessarily find that he made a false statement at all. So by definition, they did not find that he made a false statement with *mens rea*, either.

True, the jury in *Williamson I* did award punitive damages, which means that they necessarily found that his *conduct* was reckless or malicious. But reckless conduct is not the same thing as making a reckless (or worse) statement later. The jury did not find anything about his state of mind when he told his version of the events after the fact. The excessive force claim in *Williamson I* did not address Ortiz's state of mind when he gave statements about the incident.

Third, the jury in *Williamson I* did not make any finding that the statements by Ortiz were "necessary to the judicial officer's determination that probable cause existed for the arrest." *Lewis*, 914 F.3d at 477. The jury did not reach the issue of probable cause at all. As the parties agree, "[t]he Williamson I jury was not instructed on the elements of probable cause," and "never made any determination if there was probable cause to detain Mr. Williams." *See* Pls.' Resp. to Defs.' Local Rule 56.1(a)(3) Statement of Additional Facts, at ¶ 8 (Dckt. No. 98).

In effect, Williamson views the jury verdict in *Williamson I* in the light most favorable to *himself*. He views the jury verdict in *Williamson I* as a total, complete repudiation of the story told by Ortiz. Maybe it was. But that's not the only plausible reason for the jury's verdict. There were other possible avenues for the jury's decision, so collateral estoppel does not apply.

24

And at summary judgment, the inferences flow in favor of the non-movant (Ortiz), not the other way around.

**Conclusion**

For the reasons stated above, the Court denies Plaintiff's motion for summary judgment (Dckt. No. 82) and Defendants' motion for summary judgment (Dckt. No. 64).

Date:   November 28, 2020

                                                    _____
                                                    Steven C. Seeger
                                                    United States District Judge